UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -   x

UNITED STATES OF AMERICA                   :

      -v.-                                  :

                                  :     **SEALED INDICTMENT**

RONALD BAUER,                              :
  a/k/a "Patek,"                           :     22 Cr.
CRAIG AURINGER,                            :
PETAR MIHAYLOV,                            :
  a/k/a "Petar the Bulgarian,"             :
  a/k/a "PDM," and                         :
DANIEL FERRIS,                             :

              Defendants.            :

- - - - - - - - - - - - - - - - - - - -   x

**22 CRIM 155**

## COUNT ONE
### (Conspiracy to Commit Securities Fraud)

The Grand Jury charges:

### Overview

1.   From at least in or about 2013, up to and including at least in or about December 2019, RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others (collectively, the "Group"), conspired to defraud the investing public by orchestrating and facilitating multiple "pump-and-dump" stock manipulation schemes.  During the conspiracy, the members of the Group orchestrated "pump-and-dump" stock

manipulation schemes in connection with the securities of at least 12 issuers.

2. As a result of these pump-and-dump schemes, RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and their co-conspirators collectively generated at least approximately $75 million in total proceeds.

## Relevant Individuals and Entities

3. At all times relevant to this Indictment, RONALD BAUER, a/k/a "Patek," the defendant, was a citizen of Canada and the United Kingdom who resided in the United Kingdom. As is described herein, BAUER orchestrated numerous "pump-and-dump" stock manipulation schemes. BAUER was the leader of the stock manipulation schemes in which he participated and controlled the various aspects of the schemes, as described in further detail below.

4. At all times relevant to this Indictment, CRAIG AURINGER, the defendant, was a citizen of Canada who resided in the United Kingdom. As is described herein, AURINGER participated in multiple "pump-and-dump" stock manipulation schemes including by, among other things, coordinating stock promotion campaigns and by providing funding in furtherance of the stock manipulation schemes.

5.    At all times relevant to this Indictment, PETAR
MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," was a
citizen of Bulgaria who resided in Bulgaria.  As is described
herein, MIHAYLOV participated in multiple "pump-and-dump" stock
manipulation schemes by, among other things, coordinating stock
promotion campaigns and providing funding in furtherance of the
stock manipulation schemes.

6.    At all times relevant to this Indictment, DANIEL
FERRIS, the defendant, was a citizen of the United Kingdom who,
at certain times relevant to this Indictment, resided in Monaco.
As is described herein, FERRIS participated in multiple "pump-
and-dump" stock manipulation schemes.  FERRIS's participation
included, among other things, opening entities held in FERRIS's
own name that were then used to trade shares and transfer funds
in furtherance of the stock manipulation schemes, taking various
actions necessary to prepare the publicly traded companies that
were used as the vehicles for the stock manipulation schemes,
and serving as the Chief Executive Officer of at least one
publicly traded company whose shares FERRIS and his co-
conspirators thereafter manipulated.  Beginning in or about
2017, FERRIS also orchestrated additional "pump-and-dump" stock
manipulation schemes in which FERRIS took a leading role.

7.    At all times relevant to this Indictment, a co-
conspirator not named as a defendant herein ("CC-1"), was a

3

citizen of the United Kingdom and Switzerland who resided in
Switzerland.  CC-1 was a founder and co-principal of a firm
based in Switzerland that purported to offer asset management
and trustee services to its clients ("Swiss Firm-1").  CC-1 and
Swiss Firm-1 participated in the "pump-and-dump" stock
manipulation schemes by, among other things, executing trades at
the Group's direction in brokerage accounts Swiss Firm-1 had
established on behalf of various nominee entities in furtherance
of the stock manipulation schemes and by then using bank
accounts Swiss Firm-1 had established on behalf of these nominee
entities to funnel the proceeds of these schemes to the members
of the Group.

        8.   At all times relevant to this Indictment, a co-
conspirator not named as a defendant herein ("CC-2") was a
citizen of Denmark who resided in Monaco.  CC-2 participated in
the "pump-and-dump" stock manipulation schemes by, among other
things, providing the Group with access to certain services in
furtherance of their stock promotion efforts.

        9.   At all times relevant to this Indictment, a co-
conspirator not named as a defendant herein ("CC-3") was a
citizen of Canada who, at certain times relevant to this
Indictment, resided in the Cayman Islands and Antigua.  CC-3
participated in the stock manipulation schemes by, among other
things, coordinating promotional campaigns that, at times,

caused materially false and misleading information to be distributed to the investing public for the purpose of inflating the share price and trading volume of an issuer's shares.

10. At all times relevant to this Indictment, a co-conspirator not named as a defendant herein ("CC-4") was a citizen of Canada and Croatia who resided in Canada. CC-4 controlled a network of nominee entities based in Asia (the "Asian Nominee Platform") that, among other things, executed trades at the Group's direction in furtherance of the stock manipulation schemes and then funneled the proceeds of these schemes to the Group.

## Relevant Publicly Traded Companies

11. At all times relevant to this Indictment, Company-1 was a publicly traded company incorporated in Delaware. At certain times relevant to this Indictment, Company-1 purported to be based in California, and purported to be a biotechnology company focused on developing and commercializing treatments for Alzheimer's disease and Parkinson's disease. At all times relevant to this Indictment, shares of Company-1 traded on the over-the-counter ("OTC") market in the United States.

12. At all times relevant to this Indictment, Company-2 was a publicly traded company incorporated in Nevada. At certain times relevant to this Indictment, Company-2 purported to have its principal offices in California. At certain times

relevant to this Indictment, Company-2 was purportedly engaged in the development of gaming technology.  At all times relevant to this Indictment, shares of Company-2 traded on the OTC market in the United States.

13.  At all times relevant to this Indictment, Company-3 was a publicly traded company incorporated in Delaware. At certain times relevant to this Indictment, Company-3 purported to have its principal offices in California and purported to be an energy exploration company focused on exploration and development of oil and gas properties.  At all times relevant to this Indictment, shares of Company-3 traded on the OTC market in the United States.

14.  At all times relevant to this Indictment, Company-4 was a publicly traded company incorporated in Nevada.  At certain times relevant to this Indictment, Company-4 purported to have its principal offices in California, and purported to be engaged in the development of security software technology.  At all times relevant to this Indictment, shares of Company-4 traded on the OTC market in the United States.

15.  At all times relevant to this Indictment, Company-5 was a publicly traded company incorporated in Nevada.  At certain times relevant to this Indictment, Company-5 purported to have its principal offices in Nevada and purported to be engaged in developing early-stage lithium exploration

opportunities.  At all times relevant to this Indictment, shares

of Company-5 traded on the OTC market in the United States.

## Overview of the Stock Manipulation Scheme

16.   From at least in or about 2013, up to and including at

least in or about December 2019, RONALD BAUER, a/k/a "Patek,"

CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian,"

a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known

and unknown, conspired to conduct "pump-and-dump" stock

manipulation schemes with respect to the stock of numerous

issuers.

17.   To perpetrate these "pump-and-dump" stock manipulation

schemes, RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR

MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL

FERRIS, the defendants, and others known and unknown (1)

secretly amassed control of the vast majority of the stock of

certain publicly traded companies; (2) then manipulated the

price and trading volume for these stocks, causing the share

price and trading volume to become artificially inflated; and

(3) finally, sold out of their secretly-amassed positions at

these inflated values at the expense of the investing public.

18.   RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR

MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL

FERRIS, the defendants, each, respectively, worked with CC-1 and

Swiss Firm-1 in connection with numerous "pump-and-dump"

schemes.  Certain of the defendants worked together with respect to certain of these "pump-and-dump" schemes.  In particular:

a.   In connection with the stock manipulation scheme involving the shares of Company-1, BAUER, AURINGER, MIHAYLOV, FERRIS, and CC-1, among others, participated in the scheme.

b.   In connection with the stock manipulation scheme involving the shares of Company-2, BAUER, AURINGER, MIHAYLOV, and CC-1, among others, participated in the scheme.

c.   In connection with the stock manipulation scheme of Company-3, BAUER, AURINGER, and CC-1, among others, participated in the scheme.

d.   In connection with the stock manipulation scheme of Company-4, BAUER, FERRIS, and CC-1, among others, participated in the scheme.

e.   In connection with the stock manipulation scheme of Company-5, FERRIS and CC-1, among others, participated in the scheme.

### The Defendants' Network of Nominee Entities

19.   RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, secretly amassed control of the vast majority and, at times, substantially all of the stock of certain publicly traded companies that were traded on the OTC market in the United

States, including, but not limited to, Company-1 through Company-5.

20. RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, typically spread the blocks of shares the Group controlled among multiple nominee entities established at Swiss Firm-1, the Asian Nominee Platform, and other firms where the Group had access to nominee entity accounts. While these various nominee entities were nominally owned and controlled by various third-party individuals (the "nominees"), in reality the Group and their co-conspirators controlled the disposition of all of the shares these nominee entities held and, indeed, ultimately had trading authority over the shares held by these nominee entities.

21. In many instances, RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, purchased control of a publicly traded shell company from a "shell broker" and obtained control of substantially all of the shares of the publicly traded shell company whose share price they ultimately intended to manipulate in connection with the "pump-and-dump" scheme. These publicly traded shell companies frequently had few, if any, actual assets or actual business operations. The shares of these publicly traded shell

companies were frequently in the form of physical share certificates issued in the names of various individuals and entities.  BAUER, AURINGER, MIHAYLOV, FERRIS, and others, then caused these physical share certificates that they controlled – which were in the names of other individuals and entities – to be delivered to CC-1 and Swiss Firm-1 to be stored in Swiss Firm-1's safe.  Thereafter, when the Group was ready to commence the "pump," BAUER or another member of the Group would provide instructions to CC-1 or another employee of Swiss Firm-1 directing that ownership of the physical share certificates be transferred to the various nominee entities subject to their control so that these shares could be deposited into brokerage accounts for the nominee entities.

22.  In connection with the transfer of the shares to the nominee entities controlled by the Group, share purchase agreements were typically prepared reflecting that the nominee entity receiving the shares was paying consideration for receiving the shares. In truth and in fact, because the Group already controlled these shares prior to the purported share transfer, the share purchase agreements were phony and no consideration was typically paid by the nominee entities that were taking ownership of the shares.

23.  RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL

FERRIS, the defendants, and others known and unknown, typically allocated the shares that they controlled such that each of the nominee entities generally held less than five percent of the relevant issuer's shares.  The shares were allocated by the Group among the nominee entities in this manner in order to avoid disclosure obligations under the relevant federal securities laws and regulations and to circumvent brokers' compliance protocols.

24.   RONALD BAUER, a/k/a, "Patek," the defendant, established multiple nominee entity accounts with Swiss Firm-1. These nominee accounts were nominally owned by various individuals who received compensation for acting as the nominee. Swiss Firm-1 established brokerage and bank accounts on behalf of these BAUER-controlled nominee entities.  While the nominee entities were in theory owned by the named nominal owner, in reality BAUER and his co-conspirators controlled the disposition of the shares held at these nominee entities' brokerage accounts and the funds in these nominee entities' bank accounts.

25.   PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," the defendant, also established nominee entity accounts with Swiss Firm-1 that were nominally owned by other individuals but were, in reality, controlled by MIHAYLOV.

26.   CRAIG AURINGER, the defendant, established a bank account through Swiss Firm-1 in the name of an entity subject to

AURINGER's control.  AURINGER used the bank account held in the name of this entity to, among other things, receive his share of the proceeds from the stock manipulation conspiracy.

27.  DANIEL FERRIS, the defendant, established multiple brokerage and bank accounts through Swiss Firm-1 in the name of entities subject to FERRIS's control.  FERRIS and other members of the Group, including, at times, BAUER, used the bank and brokerage accounts maintained by these entities in order to trade shares and transfer funds in furtherance of the stock manipulation schemes, as well as to remit proceeds to the members of the Group.

28.  Holding the shares through this network of nominee entities allowed RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, to conceal the fact that, in reality, they controlled the disposition of the vast majority of the shares of the issuer.

29.  During the course of the conspiracy, RONALD BAUER, a/k/a "Patek," the defendant, frequently provided trading instructions to CC-1 or others at Swiss Firm-1 with respect to the sale of shares from these various nominee entity accounts. After proceeds were generated from stock sales in connection with the scheme, BAUER directed the transfer of a substantial portion of these proceeds from the nominee entities for the

benefit of BAUER, as well as for the benefit of CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others.

### The Defendants' Control of the Companies

30.   The securities that RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, sought to manipulate were issued by small companies, were thinly traded, and typically traded at less than $2 per share.  Thus, these securities were particularly susceptible to manipulation.

31.   RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, frequently installed management at the companies whose shares they sought to manipulate.  While on paper the defendants and their-conspirators had no connection to these companies, in reality they exercised substantial control, which included financing the companies' operations and funding payments for attorneys in order to prepare public filings with OTC Markets Group, Inc. and the Securities and Exchange Commission (the "SEC") in order to ensure these companies' filings were updated prior to commencing the manipulation of these companies' shares.

32.   In order to attract investor interest, RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, at times caused private businesses to be merged or "vended" into the publicly traded shell companies.  The private businesses were often in industries likely to attract the investing public's interest.

33.   In order to attract investor interest and persuade retail investors to purchase the stock of these companies, RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, at times coordinated with the management of these companies such that they issued press releases and announcements in conjunction with the stock promotions being orchestrated by the Group.  Certain of the press releases that the Group caused these companies to issue contained false and misleading statements, as well as omitted material information.

### The Defendants' Manipulative Trading

34.   RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, frequently engaged in manipulative trading activity in order to artificially increase the trading volume and share price of the

stocks.  This manipulative trading was conducted at the
direction of the defendants and their co-conspirators with the
objective of creating a misleading impression to the investing
public of bona fide market activity in order to induce the
investing public to ultimately purchase shares of these
companies.

35.  This manipulative trading activity included, at times,
coordinated "match" trades in which RONALD BAUER, a/k/a "Patek,"
CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian,"
a/k/a "PDM," and DANIEL FERRIS, the defendants, caused one
nominee entity or other brokerage account subject to their
control to sell a certain quantity of shares while causing
another nominee entity or brokerage account subject to their
control to buy a similar quantity of shares that same day.
These match trades, which often occurred on days when there was
low trading volume in these companies' shares, had the effect of
artificially increasing the share price and trading volume of
the stock and provided the investing public with the false
appearance there was actual, legitimate market activity, when,
in reality, the increase in the trading volume and share price
was due to coordinated trades orchestrated by the Group. Certain
of the trade orders in connection with the match trades were
executed in Manhattan, New York.

36.  In most instances, RONALD BAUER, a/k/a "Patek," the defendant, provided trading instructions to CC-1 and Swiss Firm-1 with respect to the various nominee entity accounts controlled by the Group at both Swiss Firm-1 and the Asian Nominee Platform.  With respect to the nominee entities at the Asian Nominee Platform, BAUER did not communicate directly with CC-4 to convey trade orders.  Instead, BAUER provided trade orders with respect to these nominee entities to CC-1 or to other individuals employed at Swiss Firm-1, which CC-1 or other individuals employed by Swiss Firm-1 thereafter conveyed to CC-4.  CC-4 then conveyed for execution these trade orders to the brokers for these nominee entities' brokerage accounts.

37.  While the stock promotion and "pump" were ongoing, RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, at times, caused the nominee entities they controlled to engage in purchases of the stock and additional match trades between their nominee entities in order to artificially support the share price and artificially inflate the trading volume of the stock.  The ultimate objective of this trading activity was to induce the investing public into purchasing shares of the company based on the misleading impression these manipulative trading tactics created.

### The Stock Promotion Campaigns

38.   As part of the "pump-and-dump" stock manipulation schemes, RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, financed and coordinated promotional campaigns through which promotional materials touting the stocks of the companies were distributed to the investing public.  These stock promotional materials frequently contained false and misleading claims about the issuer, as well as omitting material information, with the objective of inducing retail investors to purchase the shares of the issuer, thereby permitting the defendants and their co-conspirators to sell off their substantial positions for a profit.

39.   With respect to certain issuers, including Company-1 and Company-2, the Group orchestrated multiple stock promotion campaigns, with CC-3 coordinating the initial stock promotion campaign and PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," the defendant, coordinating a subsequent stock promotion campaign thereafter.

40.   With respect to many of the companies, RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, expended hundreds of thousands of

dollars on the stock promotion campaigns.  The Group frequently financed the ongoing stock promotion of a particular company using proceeds they had recently generated through their sale of large blocks of that company's shares in connection with the scheme.  On certain other occasions, the Group used the proceeds they had generated from the manipulation of one company's shares in order to finance the stock promotion of the next company whose shares they sought to manipulate.

41.   In order to conceal the true funding source for the stock promotions, RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, frequently transferred funds from the nominee entity that had generated stock sale proceeds to an intermediary entity, before then transferring those funds on to the company that was responsible for distribution of the stock promotion materials to the investing public.  By way of example, in or about June 2016, in connection with a stock promotion campaign being organized by AURINGER and CC-3, among others, one of the nominee entities that sold shares on behalf of the Group transferred a portion of the proceeds from those sales to another entity ("Intermediary Entity-1"), and Intermediary Entity-1 thereafter transferred a portion of those funds to a company responsible for distribution of the Company-1 stock promotion materials.

42.   In this manner, RONALD BAUER, a/k/a "Patek," CRAIG
AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a
"PDM," and DANIEL FERRIS, the defendants, and others known and
unknown, sought to conceal the fact that the nominee entities
subject to their control were the true funding source for the
stock promotion campaigns.

**The Defendants' Use of Boiler Rooms To Solicit Investors**

43.   In connection with the stock manipulation scheme, the
Group, at times, utilized a "boiler room" (otherwise referred to
as a "call room" or "phone room") to solicit investors,
including investors based in the United States, to purchase
shares of the relevant issuer.  These "boiler rooms" involved
multiple individuals working in a coordinated effort to contact
potential investors, often through unsolicited "cold calls," and
providing investors with false, misleading, unfounded, and/or
exaggerated information about the relevant issuer in order to
induce the potential investors to purchase shares.

44.   In the typical course, individuals who worked in the
"boiler rooms" falsely informed potential victim investors that
they worked for an unaffiliated firm that offered stock to
clients.  The individuals working for the "boiler room" did not
advise potential victim investors that, in truth and in fact,
they were being paid by the Group, who controlled a substantial

portion of the shares of the issuer and intended to sell their shares as part of the "dump."

45.   By way of example, in connection with the stock manipulation scheme of Company-4, RONALD BAUER, a/k/a "Patek," and DANIEL FERRIS, the defendants, and others arranged to provide payment to a "boiler room" operation based in Florida. In particular, in or about January and February 2017, BAUER and FERRIS caused entities that they controlled to send approximately $100,000 in wire transfers to entities controlled by the operators of the "boiler room."   In order to justify the purpose of these wire transfers to the financial institutions clearing the wires, phony invoices and agreements were created stating that these payments related to consulting services, when, in truth and in fact, the payments were to fund an ongoing fraudulent "boiler room" operation.

### The "Dump" and Laundering of the Scheme Proceeds

46.   Having artificially inflated the share prices of the relevant issuers' stock, RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, profited from the scheme by selling the shares they controlled into the market at these artificially high prices. By selling these shares while the share price was artificially inflated through their manipulative activity, the Group reaped

millions of dollars in illicit profits.  Once the Group had sold

off their shares and ceased the stock promotion campaign and

their manipulative trading tactics, the share price typically

quickly dropped precipitously.

47.  By manipulating the stock of Companies-1 through -5,

RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV,

a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the

defendants, and others known and unknown, generated millions of

dollars in proceeds.  In addition to manipulating the stock of

Companies-1 through -5, the Group also manipulated the stock of

numerous additional issuers in connection with the conspiracy

charged herein.

48.  RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR

MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL

FERRIS, the defendants, and others known and unknown, frequently

laundered the proceeds of their stock manipulation schemes with

the assistance of, among other co-conspirators, CC-1 and Swiss

Firm-1, and CC-4 and the Asian Nominee Platform.  The Group

caused their share of these crime proceeds to be remitted to

them in a manner designed to conceal the source of the funds

and/or the identity of the recipients thereof, including through

wire transfers that were executed through Manhattan, New York.

For instance, the Group used fabricated invoices and/or

fabricated contracts and agreements to justify wire transfers

from accounts held in the names of the nominee entities that had generated crime proceeds to other bank accounts controlled by the Group.  In addition, transfers of proceeds were executed in a manner intended to conceal the true source of these funds and the recipients of the funds by transferring proceeds from the sale of stock to third-party sellers of assets, including as payments for travel expenses, other business investments, private and other aircraft-related expenses, and yacht-related expenses.

### Statutory Allegations

49.   From at least in or about 2013, up to and including in or about December 2019, in the Southern District of New York and elsewhere, RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

50.   It was a part and an object of the conspiracy that RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, willfully and

knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, would and did use and employ, in connection the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5.

### Overt Acts

51.   In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about October 28, 2014, RONALD BAUER, a/k/a "Patek," and CRAIG AURINGER, the defendants, and others known and unknown, caused brokers to execute both buy and sell orders in similar quantities in Company-3's stock on behalf of nominee

entities that they controlled in connection with a "match trade."

b. In or about October 2014, BAUER caused a nominee entity subject to his control to transfer approximately $580,000 to an entity controlled by AURINGER, which funds represented proceeds of the stock manipulation conspiracy. In order to falsely justify the purpose of the transfer, a phony invoice for various amorphous services was provided when, in truth and in fact, the transfer was not for services rendered and instead represented proceeds of the stock manipulation conspiracy.

c. On or about August 28, 2015, BAUER caused a nominee entity subject to his control to transfer approximately $100,000 to a bank account held in BAUER'S own name, which wire represented proceeds of the Company-3 stock manipulation scheme. In order to falsely justify the purpose of the transfer, a fake loan agreement between BAUER and the nominee entity was provided, when, in truth and in fact, the wire transfer was not a loan and instead represented proceeds of the Company-3 stock manipulation scheme.

d. On or about September 21, 2015, BAUER, AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," the defendant, and others known and unknown, caused brokers to execute both buy and sell orders in similar quantities in

Company-2's stock on behalf of nominee entities that they
controlled in connection with a "match trade."

        e.    On or about November 4, 2015, BAUER and AURINGER
caused a nominee entity controlled by BAUER to transfer
approximately $300,000 to an entity controlled by AURINGER,
which funds represented proceeds of the Company-3 stock
manipulation scheme.

        f.    On or about November 16, 2015, BAUER exchanged
text messages with CC-1 in which BAUER, in substance and in
part, directed that CC-1 cause a nominee entity account held at
Swiss Firm-1 that BAUER controlled to purchase shares in
Company-1 in connection with a "match trade."

        g.    On or about November 16, 2015, BAUER caused
brokers to execute both buy and sell orders in similar
quantities in Company-1's stock on behalf of nominee entities
that he and his co-conspirators controlled in connection with a
"match trade."

        h.    On or about November 19, 2015, AURINGER caused an
entity that he controlled to transfer funds, which funds
represented proceeds of the stock manipulation conspiracy, to
fund a travel cash card that AURINGER thereafter used to pay for
personal expenses.

        i.    On or about November 25, 2015, a nominee entity
controlled by MIHAYLOV sent a wire transfer of approximately

$40,000 to another entity subject to MIHAYLOV's control, which wire represented proceeds of the stock manipulation conspiracy. This wire transfer was falsely justified using a fake invoice for purported consulting services, when, in truth and in fact, the wire transfer represented proceeds of the stock manipulation conspiracy.

j.    On or about March 9, 2016, BAUER, AURINGER, and others known and unknown, caused brokers to execute both buy and sell orders in similar quantities in Company-3's stock on behalf of nominee entities that they controlled in connection with a "match trade." Certain of these trade orders were executed in Manhattan, New York.

k.    In or about March 2016, BAUER caused CC-1 and Swiss Firm-1 to deliver certain physical share certificates of Company-1's stock to a transfer agent for the purpose of ownership of these shares being transferred to a nominee entity subject to the control of BAUER, AURINGER, MIHAYLOV, and DANIEL FERRIS, the defendant.

l.    On or about May 24, 2016, a nominee entity on the Asian Nominee Platform sent a wire transfer to a bank account controlled by MIHAYLOV of approximately $100,000, which wire represented proceeds of the stock manipulation conspiracy.  This wire transfer was falsely justified using a fake loan agreement

between the Asian Nominee Platform entity sending the wire and MIHAYLOV.

m.   On or about May 25, 2016, AURINGER and CC-1 exchanged text messages relating to trading shares of Company-1 through the nominee entities controlled by the Group.

n.   On or about June 2, 2016, AURINGER sent text messages to CC-1 requesting a summary of the Company-1 stock sales that had occurred through the nominee entities controlled by the Group.

o.   On or about June 8, 2016, MIHAYLOV sent a text message to CC-1 relating to MIHAYLOV's stock promotion efforts in connection with the Company-1 stock manipulation scheme.

p.   On or about June 15, 2016, BAUER, AURINGER, MIHAYLOV, FERRIS, and others known and unknown, caused brokers to execute trades in Company-1's stock on behalf of nominee entities that they controlled. Certain of these trade orders were executed in Manhattan, New York.

q.   In or about June 2016, BAUER, AURINGER, MIHAYLOV, FERRIS, and others known and unknown, caused hundreds of thousands of Company-1 stock sale proceeds to be wired from a nominee entity account that they controlled to Intermediary Entity-1, and Intermediary Entity-1 thereafter transferred a portion of these funds to another entity in order to fund an ongoing stock promotion of Company-1's stock.

r.     On or about July 27, 2016, BAUER, AURINGER, and MIHAYLOV, and others known and unknown, caused brokers to execute trades in Company-2's stock on behalf of nominee entities that they controlled. Certain of these trade orders were executed in Manhattan, New York.

s.     On or about August 22, 2016, MIHAYLOV and CC-1 exchanged text messages relating to sales in Company-1 stock that were occurring through the nominee entities controlled by the Group.

t.     On or about November 7, 2016, BAUER, AURINGER, and others known and unknown, caused brokers to execute trades in Company-3's stock on behalf of nominee entities that they controlled. Certain of these trade orders were executed in Manhattan, New York.

u.     On or about December 5, 2016, MIHAYLOV sent a text message to CC-1 relating to MIHAYLOV's stock promotion efforts in connection with the Company-1 stock manipulation scheme.

v.     On or about January 25, 2017, FERRIS and CC-1 exchanged text messages relating to the sale of Company-1 shares by nominee entities controlled by the Group and the distribution of proceeds from those sales to FERRIS.

w.     On or about January 27, 2017, BAUER, FERRIS, CC-1 and others caused proceeds of the sales of Company-1 stock to be

wire transferred from a nominee entity controlled by the Group to a bank account controlled by FERRIS.

x.   On or about January 30, 2017, BAUER, FERRIS, and others known and unknown, caused brokers to execute trades in Company-4's stock on behalf of nominee entities that they controlled.

y.   On or about February 2, 2017, BAUER, FERRIS, and others known and unknown, caused brokers to execute both buy and sell orders in similar quantities in Company-4's stock on behalf of nominee entities that they controlled in connection with a "match trade." Certain of these trade orders were executed in Manhattan, New York.

z.   On or about February 8, 2017, BAUER, FERRIS, and others known and unknown, caused brokers to execute trades in Company-4's stock on behalf of nominee entities that they controlled. Certain of these trade orders were executed in Manhattan, New York.

aa.  On or about February 17, 2017, BAUER, FERRIS, and others caused a nominee entity subject to their control to transfer proceeds from the sale of Company-4 stock to an entity controlled by FERRIS, which wire transfers were falsely described as for consulting services when, in truth and in fact, they were proceeds of the stock manipulation scheme.

bb.   In or about February 2017, BAUER, FERRIS, and others caused proceeds from the sale of Company-4 stock to be transferred between multiple entities subject to their control, and then, on or about February 17, 2017, wired a portion of these proceeds to fund the activities of a "boiler room" in connection with the Company-4 stock manipulation scheme.   The wire sent on or about February 17, 2017 to fund the operations of the "boiler room" passed through the Southern District of New York.

cc.   On or about July 24, 2017, BAUER, AURINGER, MIHAYLOV, FERRIS, and others known and unknown, caused a wire of $10,000, which wire passed through the Southern District of New York, to be sent from a nominee entity controlled by the Group to a firm that had been introduced to the Group by CC-2.   The purpose of the transfer was for the receiving firm to take steps in furtherance a stock promotion campaign relating to the Company-1 stock manipulation scheme.

dd.   On or about March 3, 2018, BAUER, AURINGER, MIHAYLOV, FERRIS, and others known and unknown, caused brokers to execute trades in Company-1's stock on behalf of nominee entities that they controlled. Certain of these trade orders were executed in Manhattan, New York.

ee.   On or about August 23, 2018, FERRIS and others known and unknown, caused brokers to execute both buy and sell

orders in similar quantities in Company-5's stock on behalf of nominee entities that they controlled in connection with a "match trade."  Certain of these trade orders were executed in Manhattan, New York.

ff.  On or about May 15, 2019, FERRIS sent an email to CC-1, among others, relating to sending a wire transfer in order to pay for control of a publicly traded shell company in connection with the stock manipulation conspiracy.  In the email FERRIS stated, in substance and in part, that the wire transfer to pay for control of the publicly traded shell company would be justified by a phony invoice.

gg.  On or about May 23, 2019, FERRIS and others known and unknown, caused brokers to execute trades in Company-5's stock on behalf of nominee entities that they controlled.

hh.  On or about June 14, 2019, FERRIS sent an email to CC-1, among others, in an effort to cause the management of Company-5 to issue a press release containing false and misleading statements in response to OTC Markets Group placing a "caveat emptor" flag on the stock of Company-5.

ii.  On or about August 6, 2019, FERRIS caused an entity he controlled to wire approximately $31,000, which represented proceeds of the Company-5 scheme, to a luxury watch seller to purchase a luxury watch for the benefit of CC-1.

(Title 18, United States Code, Section 371.)

**COUNT TWO**
(Conspiracy to Commit Wire Fraud)

The Grand Jury further charges:

52.  The allegations contained in paragraphs 1 through 48, and 51 above are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

53.  From at least in or about 2013, up to and including in or about December 2019, in the Southern District of New York, and elsewhere, RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

54.  It was a part and an object of the conspiracy that RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the

32

purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, BAUER, AURINGER, MIHAYLOV, FERRIS, and others conspired to manipulate the share price and trading volume of various publicly traded stocks, including the shares of Company-1 through Company-5, and used the wires in connection with said conspiracy, including wires that passed through the Southern District of New York.

(Title 18, United States Code, Section 1349.)

## COUNTS THREE THROUGH SEVEN
### (Securities Fraud)

The Grand Jury further charges:

55.   The allegations contained in paragraphs 1 through 48, and 51 are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

56.   On or about the dates set forth below, in the Southern District of New York and elsewhere, RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and the mails and facilities of national securities exchanges, did use and employ, and cause to be used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in contravention of Title 17, Code of

Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon persons, and aided and abetted the same, to wit, in or about the time periods set forth below, the defendants set forth below participated in a scheme to manipulate the share price and trading volume of the securities of the following companies:

| COUNT | DEFENDANTS | COMPANY | TIME PERIOD |
| --- | --- | --- | --- |
| THREE | BAUER, AURINGER, MIHAYLOV, and FERRIS | Company-1 | 2015 through October 2018 |
| FOUR | BAUER, AURINGER, and MIHAYLOV | Company-2 | 2014 through November 2016 |
| FIVE | BAUER and AURINGER | Company-3 | 2013 through November 2016 |
| SIX | BAUER and FERRIS | Company-4 | 2013 through 2018 |
| SEVEN | FERRIS | Company-5 | 2017 through 2019 |

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT EIGHT
### (Wire Fraud)

The Grand Jury further charges:

57.   The allegations contained in paragraphs 1 through 48, and 51 above are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

58.   From at least in or about 2013, up to and including at least in or about December 2019, in the Southern District of New York and elsewhere, RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, transmitted and caused to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, BAUER, AURINGER, MIHAYLOV, FERRIS, and others engaged in a scheme to manipulate the share price and trading volume of the stock of Company-1 through Company-5, as well as other stocks, which scheme involved the use of wires, including wires that passed through the Southern District of New York.

(Title 18, United States Code, Section 1343 and 2.)

## COUNT NINE
### (Conspiracy to Commit Concealment Money Laundering)

The Grand Jury further charges:

59. The allegations contained in paragraphs 1 through 48, and 51 above are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

60. From at least in or about 2013, up to and including at least in or about December 2019, in the Southern District of New York and elsewhere, RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 1956(a)(1)(B)(i).

61. It was a part and an object of the conspiracy that RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, and others known and unknown, knowing that the property involved in certain financial transactions, to wit, wire transfers to bank accounts controlled by the scheme participants and transfers to purchase assets for scheme participants, represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct such financial transactions, which in fact involved the proceeds of

specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), to wit, fraud in the sale of securities and wire fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Section 1956(h).)

## FORFEITURE ALLEGATIONS

62.   As a result of committing one or more of the offenses alleged in Counts One through Eight of this Indictment, RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to, a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

63.   As a result of committing the offense alleged in Count Nine of this Indictment, RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a

"PDM," and DANIEL FERRIS, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real and personal, involved in said offenses, or any property traceable to such property, including but not limited to a sum in United States currency representing the amount of property involved in said offenses.

### Substitute Assets Provision

64.  If any of the above-described forfeitable property, as a result of any act or omission of RONALD BAUER, a/k/a "Patek," CRAIG AURINGER, PETAR MIHAYLOV, a/k/a "Petar the Bulgarian," a/k/a "PDM," and DANIEL FERRIS, the defendants:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third person;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States

Code, Section 2461, to seek forfeiture of any other property of

the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981, 982; Title 21,
United States Code, Section 853; and
Title 28, United States Code, Section 2461.)


FOREPERSON

DAMIAN WILLIAMS
United States Attorney

39

Form No. USA-33s-274 (Ed. 9-25-58)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

- v. -

RONALD BAUER,
a/k/a "Patek,"
CRAIG AURINGER,
PETAR MIHAYLOV,
a/k/a "Petar the Bulgarian,"
a/k/a "PDM," and
DANIEL FERRIS,

Defendants.

**SEALED INDICTMENT**

22 Cr. _____

(15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R. §
240.10b-5; 18 U.S.C. §§ 371, 1343, 1349,
1956(h) & 2.)

DAMIAN WILLIAMS
United States Attorney.

**A TRUE BILL**

_____
FOREPERSON

*4 ARREST WARRANTS*
*SEALED INDICTMENT FILED*
*3/10/22  USMJ SARAH NETBURN*